

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-13-2005

# In Re:Congoleum Corp

Precedential or Non-Precedential: Precedential

Docket No. 04-3609

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"In Re:Congoleum Corp " (2005). *2005 Decisions.* Paper 296.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/296

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-3609

_____

IN RE: CONGOLEUM CORP., ET AL.

CENTURY INDEMNITY COMPANY, AS SUCCESSOR TO
CCI INSURANCE COMPANY, AS SUCCESSOR TO
INSURANCE COMPANY OF NORTH AMERICAN;
ACE AMERICAN INSURANCE COMPANY f/k/a
CIGNA INSURANCE COMPANY;  ACE PROPERTY
& CASUALTY INSURANCE COMPANY f/k/a CIGNA
PROPERTY & CASUALTY INSURANCE COMPANY,

Appellants

vs.

CONGOLEUM CORPORATION; CONGOLEUM SALES,
INC.; CONGOLEUM FISCAL, INC.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. No. 04-cv-01709)
District Judge:   Honorable Stanley R. Chesler

_____

Argued July 15, 2005
Before:  SLOVITER, McKEE and WEIS, Circuit Judges.

Filed October 13, 2005
_____

Tancred V. Schiavoni, Esquire (ARGUED)
Jonathan J. Kim, Esquire
O'Melveny & Myers LLP
7 Times Square
Times Square Tower
New York, New York   10036

Marty F. Siegal, Esquire
Siegal & Napierkowski
220 Lake Drive East
Cherry Hill, New Jersey 08002

Leonard P. Goldberger, Esquire
White & Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103

Attorneys for Appellants Century Indemnity Company; Ace
American Insurance Company; Ace Property & Casualty
Insurance Company

Richard W. Hill, Esquire (ARGUED)
Rachel L. Diehl, Esquire
Kevin J. Licciardi, Esquire
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

Kerry A. Brennan, Esquire (ARGUED)
Richard L. Epling, Esquire
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, New York   10036

Paul S. Hollander, Esq.
Okin, Hollander & DeLuca
One Parker Plaza
12th Floor
Fort Lee, NJ 07024

Attorneys for Appellees Congoleum Corporation, Congoleum
Sales, Inc., Congoleum Fiscal, Inc. and Gilbert Heintz &
Randolph, LLP

_____

OPINION

_____

WEIS, Circuit Judge.

In this pre-packaged Chapter 11 reorganization, we
hold that evidence of pre-petition conduct in this case by a law firm
is relevant to a review of a debtor's application to retain the firm as
special insurance counsel. We conclude that the bankruptcy judge
should not have granted the application here. The firm had acted
as counsel for the debtor pre-petition in negotiating settlement
arrangements with asbestos injury claimants represented by
attorneys who were co-counsel with the firm in insurance matters
for those same claimants. We conclude that conflicts existed which
precluded the firm's retention under the Rules of Professional
Conduct and the Bankruptcy Code.

Facing nearly 100,000 claims for injury caused by
asbestos in its products and the exhaustion of its primary liability
insurance coverage, Congoleum filed a declaratory judgment in the
Superior Court of New Jersey in 2001 against a number of excess
carriers.[1] The complaint was filed by the law firm of Dughi, Hewit
& Pallatucci, which had represented Congoleum in insurance
matters for more than ten years.[2]

_____

[1] Congoleum Corporation v. Ace American Ins. Co.,
et al., Superior Court of New Jersey, Law Division, Middlesex
County, Docket No. MID-L 8908-01.

[2] We take judicial notice of the state court
proceedings insofar as they are relevant here. See Furnari v.
Warden, Allenwood Federal Correctional Inst., 218 F.3d 250, 255
(3d Cir. 2000); In re Indian Palms Assocs., Ltd., 61 F.3d 197, 205
(3d Cir. 1995) (concluding that judicial notice can be taken of
certain facts such as that a document was filed, a position taken, an

3

While that litigation continued, Congoleum[3] sought relief in the Bankruptcy Court in a Chapter 11 pre-packaged plan of reorganization designed to channel existing and future asbestos claims to a trust as authorized by 11 U.S.C. § 524(g). Approval of the plan would enable Congoleum to preserve its assets and continue in business because the trust would assume its asbestos liability. Section 524(g) of the Bankruptcy Code requires that 75% of current asbestos claimants approve a plan of reorganization before a channeling order may be issued. As a result, garnering support from a large number of claimants is crucial to the success of a plan.

A unique feature of asbestos personal injury litigation is the fact that a small group of law firms represents hundreds of thousands of plaintiffs. Another notable aspect is that, because over time they may have been exposed to asbestos in various environments, some of the injured persons may have claims against a number of defendants.

The realities of securing favorable votes from thousands of claimants to meet the 75% approval requirement forces debtors to work closely with the few attorneys who represent large numbers of injured claimants. A prepackaged plan of reorganization acceptable to the debtor must be satisfactory for the claimants as well[4] and, consequently, extensive negotiations are necessary.

---

admission or allegation made "as long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority.").

[3] Congoleum Corporation, Congoleum Sales, Inc. and Congoleum Fiscal, Inc. filed for bankruptcy. We will refer to those entities as "Congoleum."

[4] Pre-packaged bankruptcies employing a channeling injunction are not eligible for the "cram down" provision contained in 11 U.S.C. § 1129(b)(1) which allows the bankruptcy court to confirm a plan of reorganization over creditors' objections in certain circumstances.

I.

In this case, negotiations between the debtor and counsel for plaintiffs produced a proposal that involved the creation of a trust funded primarily by proceeds from Congoleum's insurance carriers to pay for settlements of existing, as well as future asbestos personal injury claims. Congoleum was to contribute to the trust a $2.7 million promissary note payable ten years after confirmation and ABI, Congoleum's parent corporation, was to contribute $250,000 cash and the pledge of its shares in Congoleum to secure Congoleum's promissory note. Notably, neither Congoleum nor related entities were required to contribute equity to the trust.[5]

The pre-petition activity that occurred in this case is

---

[5] 11 U.S.C.A. § 524(g) provides for the bankruptcy channeling injunction and subsection (2)(B) contains the requirements for the injunction; it requires that –
    (i) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization –
    (I) is to assume the liabilities of a debtor ...;

    (II) is to be funded in *whole or in part by the securities of 1 or more debtors* involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;
    (III) is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of –
        (aa) each such debtor;
        (bb) the parent corporation of each such debtor; or
        (cc) a subsidiary of each such debtor that is also a debtor; and
    (IV) is to use its assets or income to pay claims and demands; ...

11 U.S.C.A. § 524(g)(emphasis added).

5

fairly typical of that in a number of asbestos pre-packaged plans. Joseph F. Rice and Perry Weitz, two plaintiffs' lawyers,[6] negotiated a settlement of numerous asbestos claims with Congoleum's counsel, Gilbert, Heintz & Randolph, LLP ("Gilbert"). The agreement employed a matrix to "resolve and settle" the amounts the various classes of claimants would receive as damages. For example, mesothelioma victims were each allocated $100,000. In contrast, those with non-malignant injuries would receive $1,000.[7]

To qualify for compensation, a participating claimant was required to provide evidence of injury and exposure to Congoleum products. Claims of the qualified participating claimants would be secured to 75% of the matrix values and the remainder would be treated as unsecured claims. In contrast to the claims of participating claimants addressed in the settlement agreement, claims settled with a separate group of claimants pre-petition would be secured in full.

## II.

The role Gilbert played in preparing the plan is challenged in this proceeding. In October 2002, Perry Weitz recommended that Congoleum retain Gilbert to assist in solving insurance coverage for Congoleum's mounting asbestos liability. Gilbert specializes in insurance coverage disputes and product

---

[6] Perry Weitz is a partner in the law firm of Weitz & Luxenberg, P.C. Joseph Rice is a partner in the law firm of Motley Rice, LLC. Those two firms represent hundreds of thousands of asbestos claimants. Weitz and Rice executed the Claimant Agreement as representatives of participating asbestos claimants.

[7] The settlement amounts were assigned as follows:
(1) mesothelioma – $100,000;
(2) lung cancer – $30,000;
(3) other cancers – $10,000;
(4) Level II non-malignant disease – $3,000; and
(5) Level I – nonmalignant disease – $1,000.

6

liability matters. It serves in a variety of capacities related to various asbestos mass tort cases and represents defendants as well as claimant and creditor committees in various asbestos bankruptcies.

At the time he recommended the firm to Congoleum, Weitz had existing co-counsel relationships with Gilbert in other asbestos related proceedings.[8] The arrangements were that Gilbert would represent the claimants in seeking recovery from the insurers of asbestos defendants.

Gilbert described its work as co-counsel with Weitz as providing:

> "insurance-related advice to certain claimants in asbestos and other contexts. [Gilbert] represents certain asbestos-related bodily injury claimants in proceedings against a primary insurer with respect to that insurer's coverage obligations . . . in pursuing coverage claims against insurers . . . and in pursuing coverage from insurers of similar defendants."

Gilbert explained that it did not represent the individual claimants with respect to the establishment of their tort claims, "but only with respect to the collection of insurance monies to pay claims that may be established."

On February 6, 2003, Gilbert entered into a formal retention agreement to advise and represent Congoleum in efforts to negotiate with claimants' counsel to settle "pending asbestos-related bodily injury" claims, and arrange for the "terms of a 'pre-packaged' plan of reorganization." For these services, Gilbert was to receive a fixed fee of $2 million from Congoleum. Congoleum

---

[8] Perry Weitz's suggestion that Congoleum contact Gilbert occurred in the midst of negotiations of claims against Congoleum by two individuals suffering from mesothelioma, Messrs. Cook and Arseneault.

also paid Perry Weitz and Joseph Rice[9] $1 million each for fees and expenses they "incurred or may incur in connection with" negotiating the pre-packaged plan.

In its letter of retention, Gilbert disclosed to Congoleum its many representations in the asbestos field, including that it had been retained to represent individual tort claimants "to provide legal advice with respect to insurance matters." Gilbert explained that its "co-counsel with respect to many of these matters is [Weitz]." Gilbert also stated that it

> "represents other clients, not listed here, that are or may be adverse to the [sic] Congoleum with respect to asbestos related claims. GHR will continue to represent these and other similarly situated clients in these capacities in the future. ... In light of the Firm's representation of entities that are potentially adverse to Congoleum in other matters, GHR

---

[9] No party has raised objections to the fees of $2 million payable to Gilbert and the $1 million each payable to Weitz and Rice. That matter is not before us and we do not rule on it at this point.

In In re: Combustion Engineering, 295 B.R. 459 (Bankr. D. N.J. 2003) (vacated on other grounds, 391 F.3d 190 (2004)), a pre-packaged asbestos bankruptcy case, Joseph Rice sought a $20 million fee for his pre-petition work. That fee was to be paid by a corporation affiliated with the debtor, but was disallowed by the bankruptcy judge because Rice had a conflict of interest.

In In re Pittsburgh Corning, 308 B.R. 716 (Bankr. W.D. Pa. 2004), the bankruptcy court refused to allow a fee of $30 million to be received by Gilbert in representing the asbestos claimants' committee. The judge found Gilbert had a conflict of interest in that pre-package asbestos proceeding.

cannot provide any legal services to Congoleum that could impair its ability to represent fully its corporate and other clients. Congoleum agrees that GHR may continue to represent or to undertake to represent existing or new clients as described above or in other matters, even though the positions taken by other clients in those matters may be adverse to the positions taken by Congoleum in those or other matters. Congoleum will not, in [sic] the basis of GHR's representation of them, object to GHR's continuing or undertaking the representation of other clients in matters where the positions taken by such clients are adverse to those taken by Congoleum in those or other matters."

In addition to negotiating on Congoleum's behalf with claimants' counsel to structure the contemplated bankruptcy reorganization, Gilbert participated in the declaratory judgment action in New Jersey state court, although the Dughi firm is the lead trial counsel in that proceeding.

Congoleum filed its reorganization petition on December 31, 2003 and on January 23, 2004 applied for bankruptcy court approval to retain Gilbert as "special insurance counsel." The application stated that Gilbert "would be primarily responsible for strategic advice on insurance issues, including but not limited to insurance-related settlement negotiations, and the representation of the Debtors with respect to insurance issues arising in the context of the Chapter 11 Cases."

The application continued, "GHR was the primary counsel that negotiated with representatives of asbestos plaintiffs to create the structure of the Debtors' Plan. GHR also represented Congoleum in negotiating and drafting asbestos settlement

agreements that liquidated numerous claims asserted against Congoleum in the tort system. The settlement of numerous asbestos claims allowed the Debtors to negotiate the Plan, which contemplates that the primary assets dedicated to pay asbestos claims will be Congoleum's right to receive insurance proceeds."

The following services "among other things" were to be provided by Gilbert:

"(a) advising and representing the Debtors in insurance-related settlement negotiations and mediations with insurers and other parties;

(b) pursuant to request of the Debtors, advising and assisting the Debtors in consultations with parties-in-interest regarding unresolved, potentially available insurance coverage;

(c) advising the Debtors as to the appropriate steps necessary to assert claims against and obtain proceeds from insurers;

(d) reviewing and analyzing insurance-related documents, data, applications, orders, operating reports, schedules and other materials;

(e) representing the Debtors at hearings concerning insurance-related issues in the bankruptcy case;

(f) advising and assisting the Debtors in preparing appropriate insurance-related legal pleadings and proposed insurance-related orders in the bankruptcy case;

(g) pursuant to requests of the Debtors, advising and assisting the Debtors with respect to insurance-

10

related issues in connection with the formulation negotiation and confirmation of a plan of reorganization;

(h) pursuant to requests of the Debtors, assisting and advising the Debtors generally with respect to insurance-related issues during the Chapter 11 Cases, and such other services as may be in the best interest of the Debtors; and

(i) preparing appropriate pleadings and orders, conducting discovery, and representing Congoleum in the Coverage Litigation (if the automatic stay is not maintained) or in any adversarial proceeding relating to the determination of insurance rights or collection of insurance claims; provided, however, that the Debtors anticipate that [Dughi] will continue to act as primary litigation counsel in the Coverage Litigation and GHR's role in this regard will consist of coordinating the Coverage Litigation with insurance settlement efforts and assisting [Dughi] as required."

Certain of Congoleum's liability insurers who had not participated in the formulation of the plan objected to the application to retain Gilbert. They alleged that Gilbert was in conflict because of the duties it owed the individual claimants it represented as co-counsel with Weitz. The insurers also pointed out that the Kenesis Group, LLC ("Kenesis"), a third party owned 70% by Gilbert and hired pre-petition by Congoleum to screen claimants, had already been disqualified from being retained to review claims in In re ACandS, Inc., 297 B.R. 395 (Bankr. D. Del. 2003), a proceeding in which Gilbert had been involved. They argued that Gilbert's extensive relationship to Perry Weitz and

11

Joseph Rice in other asbestos matters violated both the disinterestedness requirement of section 327(a) of the Bankruptcy Code and the Rules of Professional Conduct. Moreover, the details of the fee arrangement between Gilbert and Weitz had not been disclosed. The insurers also asked for discovery to further explore Gilbert's relationship with other parties involved in the bankruptcy.

On March 1, 2004, the bankruptcy judge heard argument on Congoleum's application to retain Gilbert. The United States Trustee appeared and stated that he did "not object to Gilbert Heintz' retention." The Trustee conceded, however, that "[t]here are certainly potential conflicts. And when it's potential under Marvel,[10] there's a weighing of whether it's going to become actual or not ... [a]nd we need to see what happens here."

Gilbert contended that its conduct pre-petition was not relevant to its employment as special counsel. It argued that, as to the matters listed in the application, the interests of the individuals it represented as co-counsel with Weitz were aligned with Congoleum's interests to obtain recovery from the insurers.

The bankruptcy judge granted the application to employ Gilbert, holding that the standards set in section 327(e) of the Bankruptcy Code, rather than those in section 327(a), applied and, hence, the requirement of disinterestedness of section 327(a) was not pertinent. The judge noted the difference between pre- and post- petition representation and said,

> "[w]hatever else may have gone on in the pre-petition negotiations, even if GHR was bad, bad, bad, now today, both the Debtor and GHR want to preserve and maximize the Debtor's insurance assets. I'm not making a finding about whether GHR acted improperly pre-petition.
>
> I'm just saying that its pre-petition

---

[10] In re: Marvel Entertainment Group, 140 F.3d 463 (3d Cir. 1998).

behavior cannot carry the day on a post-petition retention application for different services."

In addition to the challenge to Gilbert's retention, the insurers also contested Congoleum's employment of Kenesis Group, LLP as consultants and claim processors. Gilbert owned a 70% interest in Kenesis. Congoleum had paid $1,678,000 for Kenesis' work screening asbestos claimants.[11] Congoleum's application described Kenesis' work pre-petition, indicating that it would continue to review claims it had previously processed and determined to be deficient to determine whether the defects had been cured. In addition, the application indicated that Kenesis would perform consulting services for Congoleum's law firms, including Gilbert and Dughi.

On April 5, 2004, about one month after granting Gilbert's application, the Bankruptcy Court heard argument on the Kenesis application. In response to the objections from Congoleum's insurers and the United States Trustee, the Court denied the application. The bankruptcy judge based her denial on the "concern that Kenesis [was] not disinterested due to its relationship with [Gilbert]." The judge noted that Kenesis had been involved in "negotiating the Claimant Agreement [pre-petition] and that forms the backbone of the reorganization plan. So the Court finds that they were and continue to be involved in negotiating the plan."

The bankruptcy judge further expressed concern that Kenesis might have a conflict of interest with the debtor because the payment it received for pre-petition services might be a preference. Moreover, the court shared "the U.S. Trustee's concern that Kenesis is not disinterested due to its relationship with GHR. The prospect that GHR would be reviewing the work product of an entity with such a strong overlap of identity is still

[11] Kenesis subcontracted its work to The Clearinghouse LLC, an organization owned by an individual who was on leave of absence from a position as a paralegal at Joseph Rice's law firm. Kenesis purchased The Clearing House before beginning claims review work for Congoleum.

13

more reason that Kenesis does not meet the standards of 327."

The insurers appealed the ruling on Gilbert's retention. The District Court concluded that the bankruptcy judge was correct in her rulings on the alignment of interests and the application of section 327(e). The district judge commented that because the insurance companies were the primary source of funds to pay claimants, the carriers "have every interest in making it, to put it bluntly, difficult to confirm this bankruptcy, and that motivation is not lost on the Court."

In their appeal to this Court, the insurers raise several issues including: (1) whether the District Court erred in affirming the Bankruptcy Court's determination that retaining Gilbert violated neither the Bankruptcy Code nor the Rules of Professional Conduct; (2) whether the District Court erred by affirming that section 327(e) of the Bankruptcy Code applied rather than section 327(a); (3) whether the District Court erred in not reversing the Bankruptcy Court's findings of fact and conclusions of law where the Bankruptcy Court neither conducted an evidentiary hearing nor allowed discovery; (4) whether the District Court erred by failing to consider Gilbert's economic and other ties to lawyers representing asbestos claimants who are adverse to Congoleum; and (5) whether the District Court erred by affirming the Bankruptcy Court's denial of the insurers' Motion for Judicial Notice.

Congoleum questions whether the insurers have standing to challenge the retention of special insurance counsel.

III.

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The District Court had jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. We have before us a final order which we review under 28 U.S.C. § 1291. In re United Artists Theatre Co. V. Walton, 315 F.3d 217 (3d Cir. 2003); In re: Pillowtex, 304 F.3d 246 (3d Cir. 2002).

Because we are a court of appeals, "twice removed from the primary tribunal, we review both the factual and the legal determinations of the district court for error." In re BH & P, Inc., 949 F.2d 1300, 1305 (3d Cir. 1991)(quoting Universal Minerals,

14

Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)). In order to determine whether the District Court erred, we review the bankruptcy court's findings by the standards the District Court should have employed. Id. at 1306.

IV.

At the outset we must consider Congoleum's contention that the insurers lack standing to bring this appeal. Congoleum argues that the insurers are not creditors of the debtor, are not persons aggrieved by the retention order, and under the more restricted bankruptcy standards, lack appellate standing. In support of its position, Congoleum cites Travelers Insurance Company v. H.K. Porter Company, Inc., 45 F.3d 737 (3d Cir. 1995) and In re: Dykes, 10 F.3d 184 (3d Cir. 1993).

Article III standing need not be financial and only need be fairly traceable to the alleged illegal action. See Miller v. Nissan Motor Acceptance Corp., 362 F.3d 209, 221 (3d Cir. 2004) (listing the elements of Article III standing). In the bankruptcy field, however, we have adopted a jurisprudential rule that limits appellate standing to persons or entities that are aggrieved by an order which diminishes their property, increases their burdens, or detrimentally affects their rights. Travelers, 45 F.3d at 742.

We cited the standing distinction in In re: Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2005). We recognized the acute need to limit appeals in bankruptcy cases which often involve a myriad of parties indirectly affected by every bankruptcy court order. Combustion Engineering involved a pre-packaged Chapter 11 plan similar to the one before us. We concluded that some of the insurers had appellate standing but only with respect to the limited group of issues that affected them. Id. at 217-18.

Here, the insurers are entitled to standing even under the more restrictive standard applied to bankruptcy proceedings. The retention of special insurance counsel is an important preliminary matter that will profoundly affect the determination of the validity of a proposed plan *ab initio*. It is an issue based on procedural due process concerns that implicate the integrity of the bankruptcy court proceeding as a whole. The retention of Gilbert as special insurance counsel will affect the resolution of issues that

may directly affect the rights of insurers and fairness to the asbestos claimants.

Combustion Engineering and Dykes, on the other hand, were appeals from final orders confirming plans of reorganization. In Travelers, the objections were directed at an order reinstating certain claims. In the present case, the appeal is from an order which will affect the fairness of the entire bankruptcy proceeding, including the determination of issues such as those for which we granted insurer standing to challenge a final order in Combustion Engineering.

Further, it is extremely important to resolve this preliminary matter now; otherwise, it may never be addressed.

In re: Marvel Entertainment Group, 140 F.3d 463 (3d Cir. 1998), presented a challenge to our jurisdiction in an appeal from an order refusing the trustee's request to retain a certain law firm. We treated the bankruptcy judge's order as final, pointing out that if we did not take jurisdiction at that point, no "meaningful review" of the denial of the appointment could ever take place. Id. at 470.

We observed that once a plan has proceeded to confirmation, orders involving retention of professionals are unlikely to get the attention they deserve. Once a bankruptcy reorganization has been completed, it would be unlikely that the proceedings would commence again from the beginning to correct preliminary issues. Id.; see also In re: Amatex Corp., 755 F.2d 1034, 1040 (3d Cir. 1985) (noting that "waiting until a final plan is approved may well cause several years of hearings and negotiations to be wasted"); In re: GI Holdings, 385 F.3d 313 (3d Cir. 2004) (reviewing an order appointing a trustee prior to plan confirmation). Addressing the challenges to Gilbert's retention at this stage comports with our discussion of the unlikelihood of review late in a bankruptcy in Marvel as well as the concern for fairness and due process throughout complex bankruptcy proceedings such as this one.

In addition, counsel for the insurers has a responsibility, if not a duty, to alert the Court to ethical conflicts. Rules governing professional conduct are often viewed as even

16

more necessary and applicable in bankruptcy cases than in other contexts. See 1 Collier on Bankruptcy (15th ed.) ¶ 8.01[1] ("Thus the importance of adherence to the ethical rules, as well as disclosure, initial and continuing, cannot be overemphasized.").

There are, of course, concerns about the tactical use of disqualification motions to harass opposing counsel. See Richardson-Merrell, Inc. v. Koller, 472 U.S. 424, 436 (1985) (disqualification of counsel in a civil, not a bankruptcy appointment). Similarly, courts must be cautious about infringing on the right of the debtor to retain counsel of its choice. Nevertheless, the obligation to ensure that professional ethics are followed has led courts to rule that counsel has standing to raise and challenge unethical procedures on the part of opposing lawyers. See Kevlik v. Goldstein, 724 F.2d 844, 848 (1st Cir. 1984) (citing cases from the Courts of Appeals for the Fourth and Fifth Circuits authorizing attorneys to report ethical concerns to the court).

We raised, but did not decide, whether a "motion to disqualify must be brought by a former client" in In re: Corn Derivatives Antitrust Litigation, 748 F.2d 157, 161 (3d Cir. 1984). However, we noted, "one of the inherent powers of any federal court is the admission and discipline of attorneys practicing before it." Id. at 160.

The District Court in Schiffli Embroidery Workers' Pension Fund v. Ryan, Beck & Co., 1994 WL 62124 (D.N.J. 1994), cited then Rule 8.1 of the New Jersey Rules of Professional Conduct, which required lawyers to report violations of the Rules of Professional Conduct. Based on that duty, the court found that a lawyer had standing to present a motion to disqualify its opposing counsel.

Rule 8.3 of the New Jersey Rules of Professional Conduct is the current version of the rule addressed in Schiffli; it provides that a lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a "substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate professional authority." See also O'Connor v. Jones, 946 F.2d 1395, 1399 (8th Cir. 1991) ("In cases where

counsel is in violation of professional ethics, the court may act on motion of an aggrieved party or may act *sua sponte* to disqualify."); International Electronics Corp. v. Flanzer, 527 F.2d 1288, 1295 (2d Cir. 1975) (considering the issue of attorney conflict despite failure of parties to raise the point).

We need not decide whether the insurers' counsel had a duty to disclose Gilbert's conduct in this case. It is enough that the insurers' counsel had the right to raise the issue under the Rules of Professional Conduct and require adjudication by the court. Concluding otherwise would suggest that we do not support the long-standing role of lawyers practicing before federal courts in monitoring and reporting ethical violations.

We note also, as a practical matter, that in circumstances such as those present here, it is highly unlikely that any of the parties other than the insurers or their attorneys would challenge the application for retention of Gilbert. Congoleum, Gilbert, Perry Weitz and Joseph Rice worked together to negotiate the terms of the pre-packaged plan and all were deeply committed in having it approved. Moreover, we are aware that the standard set out in Travelers is a jurisprudential and not a strict statutory requirement for standing. We are persuaded that, in the circumstances here, the insurers and their attorneys have standing to present this appeal.

## V.

Having concluded that standing has been established, we turn to the Rules of Professional Conduct and the standards set by the Bankruptcy Code.

## A.

The District Court's local rules provide that the rules of American Bar Association, as revised by the New Jersey Supreme Court, apply to attorneys practicing before the court "subject to such modifications as may be required or permitted by federal statute, regulation, court rule or decision of law." Local Rule 103.1 (D.N.J.). In the absence of a "definitive state court decision interpreting the rules as promulgated by the [New Jersey] Supreme Court, the federal court will proceed to reach its own conclusions as to the appropriate application of the rules of

18

professional conduct.  <u>United States v. Balter</u>, 91 F.3d 427, 435 (3d Cir. 1996) (quoting New Jersey District Court Local Rules).

In <u>International Business Machines Corp. v. Levin</u>, 579 F.2d 271, 279 n.2 (3d Cir. 1978), we noted that the "conduct of practitioners before the federal courts must be governed by the rules of those courts rather than those of the state courts." However, in <u>United States v. Miller</u>, 624 F.2d 1198 (3d Cir. 1980), we approved the district court's reliance on an opinion of the Supreme Court of New Jersey in applying the local rules on professional conduct.  We observed that incorporation of state law in this field serves to avoid "detriment to the public's confidence in the integrity of the bar that might result from courts in the same state enforcing different ethical norms."  <u>Id</u>. at 1200.

State precedents as to professional responsibility should be consulted when they are compatible with federal law and policy and do not "balkanize federal law."  <u>Grievance Comm. for Southern District of New York v. Simels</u>, 48 F.3d 640, 645 (2d Cir. 1995); <u>see</u> <u>also</u> <u>Resolution Trust Corp. v. Bright</u>, 6 F.3d 336, 341 (5th Cir. 1993).  Bankruptcy professionals are required to examine their relationship not only based on the two-party litigation model, but also one guided by "a stricter, fiduciary standard."  1 Collier on Bankruptcy (15th ed.) ¶ 8.01[1].

Rule 1.7 of the New Jersey Rules of Professional Conduct, like Rule 1.7 of the ABA's Model Rules of Professional Conduct, provides that, a lawyer shall not represent a client if there is a "concurrent conflict of interest," a situation where either:

> (1) the representation of one client will be directly adverse to another client; or

> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

NJ RPC 1.7(a).[12]    Notwithstanding the existence of a concurrent

---

[12]  Rule 1.7 of the New Jersey Rules of Professional Conduct was revised in November 2003 and the new rule became

19

conflict of interest, a lawyer may undertake the representation if:

> (1) each affected client gives informed consent, confirmed in writing, after full disclosure and consultation ... [w]hen the lawyer represents multiple clients in a single matter, the consultation shall include an explanation of the common representation and the advantages and risks involved;
>
> (2) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (3) the representation is not prohibited by law; and
>
> (4) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

NJ RPC 1.7(b).

Comments to the ABA version of this rule explain the policies underlying a rule against concurrent conflicts of interest. Absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, because a conflict that materially limits a lawyer's representation of her client, even absent direct adversity may hinder a lawyer's ability to "recommend or advocate all possible positions" for her clients. Annotated Model Rules of Professional Conduct 109 (5th ed.).

As the New Jersey rule specifies, the lawyer's own interests should not be permitted to have an adverse effect on, or otherwise materially limit, the representation of a client. A lawyer

effective on January 1, 2004. The previous version of Rule 1.7 did not address situations where a lawyer's responsibilities to former clients impaired the current representation and it did not use the "significant risk language"; instead it mentioned situations where the representation of a client "may be materially limited" by a lawyer's other responsibilities. These changes do not affect our disposition of the case because Gilbert would have been acting under a concurrent conflict under either version of the rule.

cannot allow a related business interest to affect his representation, for example, by referring clients to an enterprise in which the lawyer has an identified financial interest. See id.

In addition to the standards established by professional ethics, attorneys retained in bankruptcy proceedings are also required to meet the restrictions imposed by section 327 of the Bankruptcy Code.[13] Subsection (a) restricts retention of lawyers and other professionals to those who do not hold or represent an interest adverse to the estate and are disinterested. Subsection (e) permits employment of an attorney "for a specified special purpose," so long as the attorney does not hold or represent "any interest adverse to the debtor or to the estate with respect to the matter" on which he is to be employed. The "special purpose"

_____

[13] Section 327(a) states:

" Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title."

11 U.S.C.A. § 327(a). Section 327(e) addresses professionals employed for a "specified special purpose" and provides that

"The trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed."

11 U.S.C.A. § 327(e).

Section 327 applies to a debtor in possession as well as a trustee. United States Trustee v. Price Waterhouse, 19 F.3d 138 (3d Cir. 1994).

must be unrelated to the reorganization and must be explicitly described in the application. 3 Collier on Bankruptcy (15th ed.) ¶ 327.04[9][d].

To put the matter in focus we will review Gilbert's activities in chronological order. In September 2002, when it had existing co-counsel agreements with Weitz in several asbestos matters, Gilbert represented Congoleum in settlement negotiations with Weitz to resolve the claims of two of its own clients,[14] Cook and Arsenault, whose mesothelioma claims were then in trial. Congoleum settled the cases for cash, plus a secured claim against funds that Congoleum hoped to recover from its excess insurers.[15] In November 2002, Gilbert became co-counsel with Weitz in two other asbestos bankruptcy cases.

In February 2003, Congoleum retained Gilbert for the purpose of negotiating the pre-packaged chapter 11 reorganization. The retainer called for negotiations with "key asbestos bodily injury claimants' counsel" as well as arriving at the "terms of a 'pre-packaged' plan of reorganization . . . reviewing and commenting on the plan of reorganization . . . [and] assisting or consulting with Congoleum and its bankruptcy counsel on a strategy for confirmation of the pre-packaged plan."

For most of 2003, Gilbert, Weitz and Rice worked on the terms of an agreement to settle Congoleum's current asbestos related injury claims. The settlement agreement they ultimately drafted provided for screening of each participating claimant by Kenesis, a process that was in effect during the pre-petition period. At the same time, Gilbert was assisting the Dughi firm in the coverage litigation in the New Jersey state court.

---

[14] It appears that Gilbert acted as co-counsel with Weitz for these two individuals in their claims against another bankrupt asbestos company.

[15] We note a striking disparity between the combined settlement of $16 million, which included fully secured assignments of insurance proceeds Messrs. Cook and Arseneault received, and the partially unsecured $100,000 settlement that others with mesothelioma claims would receive under the settlement agreement's disease matrix.

Weitz represented many individuals who presented claims against Congoleum and who were screened by Kenesis and who were also clients of Gilbert as co-counsel. Before the insurers' appeal reached the District Court, Gilbert produced in the New Jersey coverage action a list of claimants that it represented as co-counsel with Weitz. This list contains the names of approximately 15,000 individuals; the insurers estimated 10,000 of those individuals have claims against Congoleum. Neither Gilbert nor Congoleum have denied that there is an overlap of claimants.[16]

In at least three other asbestos claimant cases, Gilbert and Weitz had agreed to charge the individuals they jointly represented a 10% contingency fee "on any and all insurance proceeds recovered . . . [by the claimant] in connection with their claims against [the asbestos defendant] and its insurers." The insurers here assert that that same fee arrangement is present in cases against Congoleum. Gilbert has not denied that assertion despite demands that it disclose the details of its fee sharing arrangements with Weitz. Thus Gilbert represented Congoleum and actively participated in the claimants' settlement negotiations while simultaneously representing some of those claimants, albeit assertedly only in insurance matters.

In negotiating the settlement agreement and plan terms with Weitz and Rice pre-petition, Gilbert, as counsel for Congoleum, had a duty to limit the company's responsibility on such key features as the disease matrix, exposure to asbestos from Congoleum products, if any, and the extent of actual injury. Although the settlement agreement required the claimants to release Congoleum, Gilbert admitted in the coverage action in state

---

[16] In a deposition in the New Jersey coverage action, Scott Gilbert, a partner in Gilbert, was asked if any of the claimants he represented as co-counsel with Weitz in the Robert A. Keasbey case were also suing Congoleum. Scott Gilbert replied that he was unsure how many claimants overlapped and had never attempted to determine if there was an overlap. In subsequent deposition testimony he would only "assume" that Gilbert represented clients in other bankruptcies that had claims against Congoleum, including Messrs. Cooke and Arsenault.

23

court that the release was a limited one and applied only if proceeds were recovered from the insurance companies. If that attempt failed, then Congoleum would be liable to the individual claimants for the amount of the settlements, thus pitting Congoleum against the individual claimants Gilbert represents as co-counsel with Weitz.

Congoleum's interests called for a reduction in the number of claims approved that would likely be included in a settlement package presented to the insurers. The insurers cited major deficiencies in the validity of some claims approved by Kenesis. To the extent that the claims were not valid, it was Gilbert's responsibility in representing Congoleum to see that they were rejected, even though it would be adverse to Gilbert's interests if those claims were pursued individually or were excluded from a "package" offered to the insurers in settlement. This was not a potential, but an actual conflict.

To legitimize the alleged conflicts, Gilbert relies on waivers both from Congoleum and clients the firm represented as co-counsel with Weitz. However, Gilbert did not contact the claimants; instead it relied upon Weitz to secure those waivers.

As discussed above, in several earlier asbestos bankruptcy proceedings, Weitz executed engagement letters for Gilbert's work as co-counsel. In those agreements, Weitz waived "all present and future conflicts of interest on behalf of" the individual clients the firms jointly represented and agreed to advise the clients of the information contained in the engagement letters including Gilbert's disclosure of its representation of tort defendants. Gilbert has not disclosed an engagement letter with Weitz for claimants in the Congoleum case, although it has not denied that one exists.

The record does not establish that Weitz had the authority to issue waivers on behalf of the thousands of individual claimants it represented. In addition, the record does not include the information, if any, that Weitz furnished to the individuals nor does it indicate whether they were given the opportunity to object

24

to Gilbert's representation.[17]

Although concurrent conflicts may be waived by clients under the New Jersey and ABA Rules of Professional Conduct, the effect of a waiver, particularly a prospective waiver, depends upon whether the clients have given truly informed consent. Given the complexities of the bankruptcy proceeding and the "many hats" worn by Gilbert throughout the pre- and post-petition process, we cannot conclude that the purported waivers Gilbert received from Weitz "on behalf of" the individual clients constituted informed, prospective consent. See Baldasarre v. Butler, 625 A.2d 458 (N.J. 1993) (concluding that informed consent was not sufficient in a complex commercial real estate transaction); In re Matter of Edward J. Dolan, 384 A.2d 1076, 1082 (N.J. 1978) ("[T]his Court will not tolerate consents which are less than knowing, intelligent and voluntary."); In re Lanza, 322 A.2d 445 (N.J. 1974) (concluding that attorney should have first explained . . . all the facts and indicated in specific detail all of the areas of potential conflict that foreseeably might arise.").

We conclude that Gilbert did not receive effective waivers from the claimants it represented and, therefore, acted in violation of the Rules of Professional Conduct.

B.

In addition to failing to review the waiver problem, the bankruptcy judge relied on an unrealistic view that the insurance interests of the claimants and Congoleum were so closely aligned and so narrowly defined that there was no actual conflict of interest. This error was the result, to a great extent, of the

---

[17] In a subsequent proceeding, the insurers challenged Rice & Weitz's failure to disclose any type of co-counsel, consultant or fee sharing relationships as required by Bankruptcy Rule 20019. The bankruptcy judge directed Weitz, Rice and others to comply and commented that many of the creditors "have never seen a copy of the disclosure statement and, for all the court knows, have absolutely no idea how their claim will be treated under the plan." Baron & Budd, P.C. v. Unsecured Asbestos Claimant's Committee [Congoleum], 321 B.R. 147, 2005 WL 435207 (D. N.J. 2005).

25

court's refusal to consider evidence about Gilbert's activities in negotiating and preparing the plan before its filing. Those pre-petition activities were clearly separate from seeking a recovery from insurance companies after the claims were liquidated or from attempting to negotiate settlements with the insurers.[18]

The application presented to the bankruptcy court recited that Gilbert would be "primarily responsible for strategic advice on insurance issues, including but not limited to insurance-related settlement negotiations and the representation of the Debtors with respect to insurance issues arising in the context of the chapter 11 cases." However, the application also stated that Gilbert's representation had encompassed the negotiations of the plan and pre-petition settlement of asbestos claims. The application indicated that services to be provided post-petition included "advising and assisting the debtors with respect to insurance-related issues in connection with the formulation, negotiation, and confirmation of a plan of reorganization."

Although the bankruptcy court relied on the narrow role Gilbert was to have in the reorganization process, the judge did not inquire about the broad scope of Gilbert's activities in negotiating the plan and the settlement agreement. Nor did the court question Gilbert's role post-petition, as described in Congoleum's application, in "advising and assisting [Congoleum] with respect to insurance-related issues in connection with the formulation, negotiation and confirmation of a plan of reorganization."

---

[18] On May 13, 2005, the state judge in the New Jersey coverage action heard oral argument on a motion to disqualify Gilbert as counsel for Congoleum in that action. The court concluded it would "reluctantly deny the insurance companies' motion to disqualify GHR as Congoleum's attorney." The judge stated that he might have reached a different result if he had received the motion to disqualify earlier in the proceedings. The court also noted, in support of its decision not to grant the motion to disqualify, that the Bankruptcy and District Courts in this proceeding had previously denied similar motions as to Gilbert's alleged conflicts of interest.

26

Gilbert, in fact, continues to participate actively in formulating and revising the plan. There have been changes and amendments, at least four of them, to the text of the original plan thus far and Gilbert has been involved in that process. A fifth version of the plan is set for consideration some months hence.

In the usual situation, when counsel is retained to recover insurance proceeds, the underlying claim has been reduced to a judgment or settled for a specific amount. The retention of special counsel to act solely as appellate lawyer in such circumstances is an example of the intent of section 327(e). But here the claims have not been liquidated – the plan has not yet been approved and only that ruling will confirm the specific allocation of damages. Until that occurs, action against the insurers is premature. Gilbert has attempted to draw a sharp demarcation between its insurance advice and other tasks it undertook. Its efforts, however, might be likened to attempts at using a scalpel to carve a bowl of soup.

Gilbert's retention is far too expansive an assignment to be appropriate for an appointment under § 327(e). The application more properly falls under the ambit of § 327(a) which allows employment of professionals to assist generally in the administration of the estate. That subsection, however, prohibits appointments of individuals or entities who hold or represent an interest adverse to the estate and are not "disinterested."

In Marvel Entertainment Group, 140 F.3d 463 (3d Cir. 1998), we held that disqualification could be imposed where an actual conflict of interest was present or, within the discretion of the court, where a potential conflict of interest existed. The presence of the appearance of impropriety standing alone is not a sufficient ground for disqualification, id. at 477, but there is more than that here. See also In re: BHNP, 949 F.2d 1300, 1313 (3d Cir. 1991) ("[I]n some circumstances, the potential for conflict and the appearance of conflict may, without more, justify remov[al] . . .[of a trustee]."); In re: Martin, 817 F.2d 175, 180-81 (1st Cir. 1987) (concluding that section 327 addresses the appearance of impropriety, "irrespective of the integrity of person or firm under consideration."); 3 Collier on Bankruptcy (15th ed.) § 327.04[5][a] (noting that the appearance of impropriety may, when combined with a potential conflict, be sufficient for disqualification).

27

Our discussion of the Rules of Professional Conduct demonstrates that Gilbert also cannot meet the Bankruptcy Code's requirement of disinterestness contained in section 327(a). Its status as co-counsel with Weitz and its ownership interest in Kenesis represent factors which prevent Gilbert from being completely loyal to Congoleum's interests. We note also in this respect that waivers under § 327(a) are ordinarily not effective. See In re: Granite Partners LP, 219 B.R. 22, 34 (Bankr. S.D.N.Y. 1998); Collier on Bankruptcy ¶ 328.05[3] (15th ed.).

We conclude that Gilbert's employment in this case was contrary to section 327 of the Bankruptcy Code.

We do not approve of a bankruptcy court applying less than careful scrutiny to pre-petition procedures in pre-packaged plans. The parties here seek the court's *imprimatur* of a reorganization that will free the debtor of all current and future asbestos liability. The legitimacy of such a transaction is dependent on the stature of the court.[19]

In a pre-packaged setting, most of the work on a plan of reorganization that would occur in a "traditional bankruptcy" happens before the debtor files its petition. For a court to approve

---

[19] In Baron & Budd, P.C. v. Unsecured Asbestos Claimant's Committee [Congoleum], 321 B.R. 147 n.17, 2005 WL 435207 (D. N.J. 2005), a proceeding in the Congoleum case subsequent to this one, both courts agreed that pre-petition relationships were relevant. "The totality of the facts before the bankruptcy court suggest the opportunity for abuse of fee sharing relationships, involving attorneys in connection with the pre-petition process, to the end of conferring preferential security interests on appellant's clients."

See also S. Elizabeth Gibson, Fed. Judicial Ctr., Judicial Management of Mass Tort Bankruptcy Cases 122 (2005). ("A judge presented with a prepackaged mass tort plan needs to be fully informed about the circumstances surrounding the prepetition negotiations in order to determine whether the process has been tainted by conflicts of interest or self-interested actions by the participants.").

a pre-packaged plan whose preparation was tainted with overreaching, for example, would be a perversion of the bankruptcy process.

Pre-packaged plans offer a means of expediting the bankruptcy process by doing most of the work in advance of filing. That efficiency, however, must not be obtained at the price of diminishing the integrity of the process. In this case, it was not a proper exercise of the bankruptcy court's discretion to fail to consider and appraise the conduct of the parties and counsel pre-petition.

We observe also that the bankruptcy court has an obligation to prevent unnecessary expenditures in the administration of an estate. See In re: Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833 (3d Cir. 1994) (holding that the bankruptcy court has authority to examine counsel fees *sua sponte*). Even if it be assumed that Gilbert's representation of Congoleum post-petition was exclusively related to its forthcoming disputes with the insurers, it is not clear on this record why it was necessary to appoint an additional firm to handle insurance issues. The Dughi firm had represented Congoleum for more than ten years in insurance matters and had been actively engaged in the state court coverage action since 2001. The record fails to reveal what special competence in the insurance field Gilbert would provide in addition to that of the Dughi firm.

The flood of asbestos litigation has been a serious problem for the courts of this country because the large number of claims are not easily adaptable to traditional common law procedures. See Achem Products v. Windsor, 521 U.S. 591 (1997); Combustion Engineering, 391 F.3d at 200. Congress has provided for the use of a trust and channeling injunction as a possible solution, but it appears that the proposals for implementation of an administrative system somewhat similar to that used in black lung claims are more promising.

As this case demonstrates, leaving the procedures for allocation of resources predominantly in the hands of private, conflicting interests has led to problems of fair and equal resolution. The need for counsel with undivided loyalties is more pressing in cases of this nature than in more familiar conventional litigation. Correspondingly, the level of court supervision must be

29

of a high order.

Many of the issues are similar to those that arise in class actions for personal injuries. In re: Community Bank of Northern Virginia, 418 F.3d 277 (3d Cir. 2005), we commented that "in class actions, particularly settlement-only suits, the district court has a duty 'to protect the members of the class . . . from lawyers for the class who may, in derogation of their professional and fiduciary obligations, place their pecuniary self-interest ahead of that of the class.'" Id. at 318 (quoting Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 279 (7th Cir. 2002)). We need make no finding that this has occurred in the case before us, but we caution that here, as in situations of settlement-only class litigation, "careful and comprehensive scrutiny is required."

We recognize that ordinarily a remand to the District and Bankruptcy courts would be in order for further findings and appropriate action. However, here the record contains sufficient evidence that we may expedite the procedures. Therefore, we will reverse the order approving the retention of the Gilbert firm and remand to the District Court for further proceedings consistent with this Opinion.