PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-3650
_____

In re:  GLOBAL INDUSTRIAL TECHNOLOGIES, INC.,
et al.,

Debtors.
------------------------------

HARTFORD ACCIDENT AND INDEMNITY COMPANY;
FIRST STATE INSURANCE COMPANY CO;
TWIN CITY FIRE INSURANCE COMPANY;
CENTURY INDEMNITY COMPANY, as successor to
CIGNA Specialty Company, formerly known as California
Union Insurance Company; WESTCHESTER FIRE
INSURANCE COMPANY, for itself and for International
Insurance Company (now known as TIG Insurance Company)
(by operation of novation all rights and obligations under the
policies have been transferred from International Insurance
Co. to Westchester Fire Insurance Co.); NATIONAL UNION
FIRE INSURANCE COMPANY OF PITTSBURGH, PA;
INSURANCE COMPANY OF THE STATE OF
PENNSYLVANIA; LEXINGTON INSURANCE
COMPANY; AMERICAN HOME ASSURANCE
COMPANY, and any other entities related to American
International Group, Inc. that engaged in business

transactions with the Reorganizing Debtors,

Appellants

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 07-cv-1749)
District Judge:  Honorable Gary L. Lancaster

_____

Argued May 21, 2009

Before:   FUENTES, JORDAN and NYGAARD, *Circuit Judges*.

Reargued En Banc October 13, 2010
Before: McKEE, *Chief Judge*, SCIRICA, AMBRO,
FUENTES, SMITH, FISHER, CHAGARES, JORDAN,
VANASKIE, and NYGAARD, *Circuit Judges*

(Filed: May 4, 2011)

_____

Craig Goldblatt   [ARGUED]
Danielle M. Spinelli
Seth P. Waxman
Wilmer Cutler Pickering Hale & Dorr
1875 Pennsylvania Avenue, NW
Washington, DC   20006
    *Counsel for Appellants*
    *Hartford Accident & Indemnity Company,*
    *First State Ins Co., and Twin City Fire Ins.*

John D. Demmy
Stevens & Lee
1105 N. Market Street - #700
Wilmington, DE   19801
*Counsel for Appellants*
*Century Indemnity Co. and*
*Westchester Fire Ins.*

Michael S. Davis
Zeichner, Ellman & Krause  LLP
575 Lexington Avenue
New York, NY   10022

Beverly Weiss Manne
Tucker Arensberg, PC
1500 PPG Place
Pittsburgh, PA   15222
*Counsel for Appellants*
*Nat'l Union Fire Ins. Co. of Pittsburgh, PA,*
*Insurance Company of Pennsylvania,*
*Lexington Insurance Company and*
*American Home Assurance Company*

Douglas A. Campbell
David B. Salzman
Campbell & Levine
3300 Grant Street - #1700
Pittsburgh, PA   15219

Elihu Inselbuch
Caplin & Drysdale
375 Park Avenue – 35th Fl.
New York, NY 10152

Peter V. Lockwood   [ARGUED]
Kevin C. Maclay
Caplin & Drysdale
One Thomas Circle, NW - #1100
Washington, DC   20005
        *Counsel for Appellee,*
        *Official Committee of Asbestos Creditors*

Robert G. Sable
Sally E. Edison
Nicholas E. Meriwether
McGuire Woods LLP
625 Liberty Avenue – 23rd Fl.
Pittsburgh, PA   15222

James J. Restivo   [ARGUED]
Paul M. Singer
David Ziegler
Reed Smith
225 Fifth Avenue
Pittsburgh, PA   15222
        *Counsel for Appellee,*
        *Global Industrial Technologies Inc.*

Gary Philip Nelson
Sherrard, German & Kelly, P.C.
28th Fl., Two PNC Plaza
Pittsburgh, PA   15222
        *Counsel for Philip A. Pahigian,*
        *Legal Representative of Future Silica*
        *Claimants against Global Industrial*
        *Technologies, Inc., et alia*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Hartford Accident and Indemnity Company, First State Insurance Company, and Twin City Fire Insurance Company (collectively, "Hartford"[1]); Century Indemnity Company and Westchester Fire Insurance Company (collectively, "Century"[2]); and National Union Fire Insurance Company of Pittsburgh, PA, Insurance Company of the State of Pennsylvania, Lexington Insurance Company, American Home Insurance Company, and other entities related to American International Group, Inc. (collectively, "AIG") appeal from an order entered by the United States District Court for the Western District of Pennsylvania denying Hartford and Century standing to challenge the confirmation of a plan of reorganization filed by Global Industrial Technologies, Inc. ("GIT") and affirming the plan's confirmation.[3]   Among other things, the District Court,

_____

[1] The Hartford Financial Services Group, Inc., is a parent corporation of all three insurers but is not party to this appeal.

[2] Century Indemnity Company and Westchester Fire Insurance Company are both subsidiaries of parent company ACE Limited, which is not participating in this appeal.

[3] The appellees are GIT, the Official Committee of Asbestos Creditors and Unsecured Trade Creditors, and the Legal Representatives for Future Asbestos and Silica Claimants.  In this opinion, when referring to arguments made

following the reasoning of the Bankruptcy Court, determined that Hartford and Century lacked standing to participate in bankruptcy proceedings concerning GIT's Chapter 11 reorganization. Because we conclude that Hartford and Century meet the standing requirements to be heard in those proceedings and that further factual development may aid in the resolution of other issues raised on appeal, we will vacate the District Court's order and have the case remanded to the Bankruptcy Court. The decision we announce is no more far-reaching than this: when a federal court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard and to have their legitimate objections addressed. In short, they at least have bankruptcy standing.[4]

---

by all of the appellees, we attribute them simply to GIT for convenience.

[4] We note at the outset our disagreement with our dissenting colleagues' characterization of this case as one that developed in the District and Bankruptcy Courts "with the full participation of the excess insurers." (Dissent slip op. at 1.) If the insurers, including appellants Harford and Century, had been granted standing by the Bankruptcy Court, it could rightly be said that they had had full participation. But, though they had some opportunity to voice their objections, as is more fully described herein, they were denied standing to object to GIT's plan of reorganization. That refusal to give them their proper place at the litigation table is the whole point of this appeal.

## I. Background

This case arises from Chapter 11 petitions filed in 2002 by GIT and certain of its subsidiaries. GIT was formed in 1995 as a publicly traded holding company for several businesses, including manufacturers and sellers of refractory products.[5] In 1998, as part of its strategy to grow and develop its refractory business, GIT acquired A.P. Green Industries, Inc. ("APG"),[6] a long-time manufacturer and seller of refractory products.

Before the mid-1970s, some of the products that APG manufactured had asbestos as an ingredient. Although APG had stopped including asbestos in its products by 1976, its prior asbestos use triggered an avalanche of personal injury lawsuits. Beginning in the 1980s and continuing through early 2002, APG spent approximately $448 million in resolving over 200,000 asbestos-related claims. In addition to those claims, APG had, as of February 2002, approximately 235,000 additional asbestos-related claims still pending against it. From the portion of those pending claims that had been liquidated, APG had unpaid obligations totaling $491 million.

During that same period, APG also faced silica-related personal injury claims, though on a vastly smaller scale.

---

[5] Refractory products are "construction-type materials specifically designed and manufactured for use in high-temperature applications." (App. at 87)

[6] For convenience, we refer to APG and its related entities collectively as "APG."

From 1977 to 2002, APG dealt with 23 silica-related lawsuits. Travelers Indemnity Company spent approximately $312,000 settling or litigating those suits on APG's behalf, with APG contributing $50,000 towards settlement of one of the suits. As of February 2002, APG had one silica-related suit, a class action consisting of 169 claims, pending against it in Texas state court.

In February of 2002, GIT, APG, and certain related entities (collectively, the "debtors") sought protection under Chapter 11 of the Bankruptcy Code because of adverse business conditions and the staggering number of asbestos-related claims pending against them. The debtors did not identify silica-related liability as a motivation for seeking bankruptcy relief.

For their plan of reorganization (the "Plan") to relieve them of asbestos-related liability, the debtors needed to obtain approval of the Plan by 75% of the then-current asbestos claimants.[7] While the record is less than clear, it seems that, to solicit the required votes, the debtors necessarily reached out to those asbestos claimants' attorneys, many of whom also represented persons with silica-related claims against other companies.[8] The availability of hundreds of millions of

---

[7] Under 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), at least 75% of a debtor's asbestos claimants must support an asbestos settlement trust, if a reorganization plan containing such a trust is to be confirmed.

[8] We have before acknowledged that "[t]he realities of securing favorable votes from thousands of claimants to meet the 75% approval requirement forces debtors to work closely

8

dollars of insurance coverage was evidently assumed and ultimately featured prominently in the debtors' proposed Plan. The Plan called for entry of a channeling injunction (the "Asbestos Injunction") pursuant to which asbestos-related claims that had or could be brought against the debtors would instead be channeled to a trust specifically created to assess and resolve claims (the "APG Asbestos Trust").[9] The Plan also called for entry of an injunction (the "Silica Injunction") channeling silica-related claims to a silica trust (the "APG Silica Trust"; together with the APG Asbestos Trust, the "Trusts").[10] Insurance was to fund both Trusts,

---

with the few attorneys who represent large numbers of injured claimants." *In re Congoleum Corp.*, 426 F.3d 675, 680 (3d Cir. 2005).

[9] Pursuant to 11 U.S.C. § 524(g), a bankruptcy court may enjoin asbestos-related litigation against a debtor or qualifying third party and channel the claims into a settlement trust if the court determines (1) "the debtor is likely to be subject to substantial future demands for payment arising out of" asbestos-related claims; (2) "the actual amounts, numbers, and timing of such future demands cannot be determined"; and (3) "pursuit of such demands outside the [trust] is likely to threaten the [reorganization] plan's purpose to deal equitably with claims and future demands." 11 U.S.C. § 24(g)(2)(B)(ii).

[10] While § 524(g) of the Bankruptcy Code only expressly authorizes the establishment of a trust and the entry of a channeling injunction to address asbestos liability, several courts have concluded that trusts and channeling injunctions may be authorized under § 105(a) and § 1123(b)(6) of the Bankruptcy Code to address other mass

either in the form of cash from APG's settlement of disputes involving certain insurance policies or, with respect to the APG Silica Trust, in the form of insurance coverage under certain policies to be assigned to the APG Silica Trust by APG.[11] Hartford and Century were among the insurers whose policies were to be assigned to the APG Silica Trust.[12]

---

tort liabilities where a trust and channeling injunction would play "an important part in the debtor's reorganization plan." *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) (authorizing channeling injunction for securities class action claims); *see also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002) (authorizing channeling injunction for silicone breast implant claims); *Menard-Sanford v. Mabey (In re A.H. Robbins Co.)*, 880 F.2d 694 (4th Cir. 1989) (authorizing channeling injunction for Dalkon Shield birth control device claims). Under the debtors' proposed Plan, only silica claims based on pre-petition exposure would be channeled to the APG Silica Trust. Claims based on post-petition exposure were to become the responsibility of the reorganized debtors.

[11] Several insurers disputed their obligations under policies issued to APG. APG subsequently reached settlement agreements with those insurers, releasing them from liability under their policies. In exchange, APG received approximately $365.6 million, of which $31.5 million was to be used to fund the APG Silica Trust. The APG Silica Trust was otherwise to be funded by the assignment of certain insurance policies that debtors believe provide coverage for silica-related liabilities.

[12] Because we are only concerned at this point with

10

Regarding the rights of Hartford, Century, and the other insurers whose policies were to be assigned to the APG Silica Trust, the Plan provided that nothing therein or in Plan-related documents or in the Bankruptcy Court's confirmation order would preclude those insurers from asserting any rights or defenses under the policies, except those related to "anti-assignment provisions." Hartford's and Century's coverage obligations to the APG Silica Trust would still be contingent on the APG Silica Trust incurring liability and any claims for reimbursement overcoming Hartford's and Century's coverage defenses.

For the Plan to be approved as designed (*i.e.*, with the inclusion of the Silica Injunction), the debtors needed to show that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C. § 105(a), which, under our precedent, requires showing with specificity that the Silica Injunction is both necessary to the reorganization and fair.[13] *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000) (holding that a third-party injunction would only be proper under § 105(a) if

whether the putative injuries inflicted by the APG Silica Trust and Silica Injunction provide bankruptcy standing for Hartford and Century, we refer to those injuries only as they relate to Hartford and Century, even though those injuries would appear to be common to all insurers whose policies were assigned to the APG Silica Trust.

[13] Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair). In practical terms, this meant showing that the silica-related liability was sufficiently onerous to jeopardize the debtors' reorganization if not resolved via the Silica Injunction and APG Silica Trust. *See id.* at 215 (noting that the debtors had failed to show the necessity of the injunction where they had not demonstrated that the success of the reorganization hinged in any way on the issuance of the injunction).

With that as background, the debtors obtained a list of silica claimants from another company's bankruptcy and then solicited confirmation votes from those claimants' counsel. An explosion of silica claims ensued. Ultimately, 5,125 votes for the debtors' Plan were cast on behalf of persons alleging that APG was responsible for their claimed silica-related injuries. The majority of those votes were submitted by a handful of law firms, with five law firms accounting for 4,039 votes. Each of the law firms that submitted votes on behalf of silica claimants also submitted votes on behalf of asbestos claimants. The requisite majority of both groups of claimants voted in favor of the Plan.

In June 2006, the Bankruptcy Court held a hearing on plan confirmation. Hartford, Century, and AIG (collectively, the "Objecting Insurers") objected to the Plan, asserting that the APG Silica Trust and the Silica Injunction were the products of collusion with the asbestos claimants' counsel and, under § 105 of the Bankruptcy Code, were neither necessary nor appropriate for the debtors' successful reorganization. In response, the Bankruptcy Court continued the confirmation hearing and ordered the silica claimants to

12

provide supplemental information regarding their silica-related diagnoses, their exposure to APG's silica products, and any prior diagnoses of or claims for asbestos-related diseases. The claimants then provided several thousand supplemental submissions, many of which were duplicative or otherwise deficient. Ultimately 4,626 individual silica claims were recognized to be at issue.[14]

In October 2006, the Bankruptcy Court resumed the confirmation hearing, during which the Objecting Insurers pressed their reasons for questioning the legitimacy of the silica claims. One set of criticisms stemmed from findings provided by the Manville Personal Injury Settlement Trust (the "Manville Trust"), which was established for asbestos-related claims associated with the bankruptcy of the Johns-Manville Corporation. The Manville Trust found that certain

---

[14] At some point after the silica claimant votes were solicited, Robert G. Taylor II, P.C., withdrew 489 of the 525 silica claimant votes that it had cast, explaining that those claimants' claims had been dismissed in litigation. That left 4,636 silica claimants, from which 4,822 supplemental submissions were received. The Objecting Insurers concluded, after reviewing the supplemental submissions, that 196 were duplicates and so, subtracting those from the 4,822 received, conducted their claims analysis with 4,626 unique claims as their starting point. In contrast, the debtors apparently subtracted the 489 withdrawn claimants from the 5,125 original claimants and conducted their claims analysis with 4,636 remaining silica claimants as their starting point. For our purposes, the discrepancy between the two starting points is immaterial.

physicians' diagnoses were not credible and, accordingly, it banned those physicians.[15] The Manville Trust also found that certain physicians generated a "high volume" of diagnoses that, at a high rate, proved to be inaccurate. According to the Objecting Insurers, those Manville Trust findings are germane here because, of the silica claimants in the GIT bankruptcy who identified a diagnosing physician or facility, 56.9% indicate a diagnosis by a physician or facility that has been banned by the Manville Trust. An additional 27.8% of such claims are suspect, the Objecting Insurers argued, because they involve diagnoses by two of the physicians singled out by the Manville Trust for being highly unreliable.

Another set of criticisms presented to the Bankruptcy Court stemmed from findings made in the course of multidistrict litigation involving silica products liability. The United States District Court for the Southern District of Texas, which was charged with handling the multidistrict litigation, discounted several physicians' diagnoses because of their diagnostic methods, which the Court described as "rang[ing] from questionable to abysmal." *In re Silica Products Liability Litig.*, 398 F. Supp. 2d 563, 622 (S.D. Tex. 2005). In particular, the *Silica Products* Court disparaged silica claims brought by people who had earlier been diagnosed with an asbestos-related disease or had filed an asbestos-related claim against an asbestos trust, noting that "a

---

[15] While the record before us is not explicit on this point, we understand that the "banning" of physicians means that the Manville Trust would not accept claims supported by those physicians' diagnoses.

14

golfer is more likely to hit a hole-in-one than an occupational medicine specialist is to find a single case of both silicosis and asbestosis."[16] *Id.* at 603.

The Objecting Insurers pointed out to the Bankruptcy Court – and the debtors acknowledged – that 55.5% of the silica claims at issue in this case involve diagnoses from physicians who were discredited by the *Silica Products* Court. The Objecting Insurers further pointed out that more than half of the silica claims are from persons who had either been diagnosed with an asbestos-related disease or filed an asbestos-related claim against an asbestos trust or both, thus making their silicosis diagnoses highly suspect. All told, the Bankruptcy Court heard evidence questioning the legitimacy of 91.5% of the silica claims made against the debtors.

Notwithstanding that evidence, the Bankruptcy Court confirmed the Plan on November 14, 2007, concluding that the APG Silica Trust and the Silica Injunction were necessary to the debtors' reorganization. The Bankruptcy Court made no findings as to the legitimacy of the silica claims, but it did credit the debtors' projection of future silica claims and reasoned that "[w]hether or not [the] claims prove to be compensable, [the debtors] must address them, either in the tort system with its inherent risks and the possibility that any

---

[16] As an example, the Court noted the questionable diagnoses generated by one small diagnostic company, which, despite the extreme improbability of persons having both silicosis and asbestosis, had purportedly discovered 4,000 such persons by "park[ing] a van in some parking lots." *Silica Products*, 398 F. Supp. 2d at 603.

15

one judgment could be materially adverse and constitute a default under its financing covenants, or through a trust."[17]

The Bankruptcy Court also determined that Hartford and Century lacked standing to object to the Plan.[18] The Court rejected Hartford's and Century's arguments that they had suffered injury from the Plan, concluding that the assignment of Hartford's and Century's policies to the APG Silica Trust in contravention of the policies' anti-assignment provisions was not injurious because the Bankruptcy Code and state law rendered those provisions a nullity. The Court further reasoned that any potential financial harm arising out of the assignments was too speculative because Hartford and Century had not contributed and were not required to contribute "anything" to the APG Silica Trust and would still be able to assert their coverage defenses and contractual

---

[17] Contrary to the Dissent's assertion that "the Bankruptcy Court … established the facial legitimacy of [the silicosis] claims" (Dissent slip op. at 1), the Court's opinion shows that it declined to make any findings of legitimacy, and its solicitation of proffers from the silica claimants cannot credibly be viewed as an endorsement of the claims. Thus, even if we accept the Dissent's contention that the Objecting Insurers do not challenge the Bankruptcy Court's factual findings, that does not mean that the facial legitimacy of the silica claims has been conceded, as the Dissent seems to suggest. (*Id.*) Rather, the factual premise of the Objecting Insurers' position on appeal remains that the silica claims are not legitimate.

[18] Because AIG was not just an insurer but also a creditor, its standing was not contested.

rights if ever faced with putative obligations to reimburse the APG Silica Trust on silica-related claims.[19] The District Court affirmed the Bankruptcy Court's confirmation of the plan and its determination that Hartford and Century lacked standing to challenge the Plan.

In the timely appeal now before us, the Objecting Insurers challenge both the ruling that Hartford and Century lacked standing to object to the GIT Plan and the ruling that the APG Silica Trust and Silica Injunction are lawful.[20] Also

---

[19] To say that the Plan does not require Hartford and Century to contribute "anything" to the APG Silica Trust is an overstatement because, as outlined above, the Plan calls for the Hartford's and Century's policies to be assigned to the APG Silica Trust, which is certainly "something." Even if we were to understand the Bankruptcy Court to mean that Hartford and Century are not required to contribute any funds, the reality is that, by requiring Hartford and Century to provide insurance coverage, the Plan requires them to make significant contributions to the APG Silica Trust.

[20] The Objecting Insurers challenge the Bankruptcy Court's determination that the APG Silica Trust and the Silica Injunction were necessary to the debtors' reorganization and thus lawful pursuant to 11 U.S.C. § 105, arguing that the debtors faced no significant silica-related liability other than that generated through collusion with the claimants' counsel. Separately, AIG, in its status as a creditor, argues that the APG Silica Trust violates both 11 U.S.C. §§ 502(a) and 502(b)(1). Specifically, AIG argues that the APG Silica Trust violates § 502(b)(1) because its distribution procedures permit payment of claims that could not be paid outside of

17

implicated is the Objecting Insurers' standing to bring this appeal.[21]

---

bankruptcy – claims that AIG asserts are precluded in the tort system because they post-date APG's implementation of safety measures in 2000. AIG argues that those distribution procedures also violate § 502(a) by divesting AIG, as a party in interest, of its right to object to the payment of such claims.

[21] Although GIT concedes that AIG had standing in the Bankruptcy Court, GIT contends that AIG fails the more stringent "persons aggrieved" standard for bankruptcy appellate standing discussed in *In re Combustion Engineering, Inc.*, 391 F.3d 190, 215 (3d Cir. 2004) (explaining that "[a]ppellate standing in the bankruptcy context is more restrictive than Article III standing" and that "parties involved in bankruptcy proceedings" may nonetheless lack standing to appeal).

## II.    Discussion[22]

### A.    *Standard of Review*

"In this appeal, we 'stand in the shoes' of the District Court and review the Bankruptcy Court's decision." *In re Pransky*, 318 F.3d 536, 542 (3d Cir. 2003) (quoting *In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 635 (3d Cir. 1998)).  Accordingly, we review the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error.  *Id.*   A court's decision regarding standing is a legal conclusion subject to *de novo* review.  *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005).

### B.    *Standing*

As alluded to previously, two types of standing are contested here:  Hartford's and Century's standing to object to the confirmation of the GIT Plan in the Bankruptcy Court ("bankruptcy standing") and the standing of each of the

---

[22] The District Court had original jurisdiction over the GIT Chapter 11 proceedings pursuant to 28 U.S.C. § 1334(a) and referred the matter to the Bankruptcy Court pursuant to 28 U.S.C. § 157(a).  The Bankruptcy Court had jurisdiction over the plan confirmation proceedings pursuant to 28 U.S.C. § 1334(b).   The District Court had jurisdiction over Hartford's appeal of the confirmed reorganization plan under 28 U.S.C. § 158(a).  We have jurisdiction over the current appeal pursuant to 28 U.S.C. § 158(d)(1).  Moreover, because the District Court's order affirming plan confirmation was a final order, we have jurisdiction under 28 U.S.C. § 1291.

Objecting Insurers to appeal that confirmation ruling ("appellate standing"). However, our disposition of this appeal treats only the first of those, bankruptcy standing. Because we conclude that Hartford and Century have bankruptcy standing and that further development of the factual record may aid in the resolution of other issues, including appellate standing, the appropriate remedy is a remand that will allow the Bankruptcy Court to hear Hartford and Century and to make a more fully informed decision. We, therefore, address only bankruptcy standing at this time.[23]

---

[23] If it turns out that the Plan is not confirmed, that would in all likelihood render moot any consideration of other issues raised by the Objecting Insurers, including their appellate standing. The "appellate standing" to which we refer and which we decline to address at this time is standing to appeal the substance of the bankruptcy court's decision. Standing in that regard is distinct from standing to appeal the bankruptcy court's decision regarding bankruptcy standing. With respect to the latter, we have stated in a non-bankruptcy context that "[a] party denied standing to sue, or to intervene, or to object, may obviously appeal such a determination." *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1064 (3d Cir. 1976). Applying that principle in the bankruptcy context makes intuitive sense, since to require a party to satisfy the more stringent standard for bankruptcy appellate standing, *Combustion Eng'g*, 391 F.3d at 215, before addressing the question of whether the party satisfied the more relaxed standard for bankruptcy standing, *PWS Holding*, 228 F.3d at 249, would be putting the cart before the horse. Moreover, it would risk leaving parties in interest who have been erroneously denied bankruptcy

To object to the confirmation of a reorganization plan in bankruptcy court, a party must, in the first instance, meet the requirements for standing that litigants in all federal cases face under Article III of the Constitution. *See Danvers*, 432 F.3d at 290-91. A party seeking constitutional standing must demonstrate an "injury in fact" that is "concrete", "distinct and palpable", and "actual or imminent." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). Additionally, the party must establish that the injury "fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Id.* (internal quotations omitted). We have noted that "[t]he contours of the injury-in-fact requirement, while not precisely defined, are very generous." *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982). The standard is met as long as the party alleges a "specific, 'identifiable trifle' of injury," *id.* (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686-90, 690 n.14 (1973)), or a "personal stake in the outcome of [the] litigation," *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000). *See In re Congoleum Corp.*, 426 F.3d 675, 685 (3d Cir. 2005) ("Article III standing need not be financial and only need be fairly traceable to the alleged illegal action.").

standing, but who do not meet the more stringent requirements for appellate standing, without legal redress for that error. We have implicitly adhered to that principle in the bankruptcy context by resolving bankruptcy standing issues on appeal without reaching the question of bankruptcy appellate standing. *See, e.g., In re Amatex Corp.*, 755 F.2d 1034 (3d Cir. 1985) (addressing, *inter alia*, a would-be intervenor's "party-in-interest" standing without reaching the question of whether he had bankruptcy appellate standing).

Standing in bankruptcy cases is also governed by the terms of 11 U.S.C. § 1109(b), which provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). The list of potential parties in interest in § 1109(b) is not exclusive. On the contrary, that section "has been construed to create a broad right of participation in Chapter 11 cases." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.21 (3d Cir. 2004). The United States Court of Appeals for the Seventh Circuit has described a party in interest as "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." *In re James Wilson Associates*, 965 F.2d 160, 169 (7th Cir. 1992). That "party in interest" test comports with our own definition of a "party in interest" as one who "has a sufficient stake in the proceeding so as to require representation." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985). We thus adopt the test set forth by the Seventh Circuit in *James Wilson* as a helpful amplification of our definition in *Amatex*. Status as a party in interest is of particular relevance here because the Bankruptcy Code expressly provides that parties in interest "may object to confirmation of a plan." 11 U.S.C. § 1128(b).

In applying the teachings of *James Wilson* and *Amatex*, we are guided by our previous statement that "[s]ection 1109(b) must be construed broadly to permit parties affected by a chapter 11 proceeding to appear and be heard." *Amatex*, 755 F.2d at 1042 (citation omitted) (internal quotation marks omitted). The District Court described the Bankruptcy Code's "party in interest" standard as "more exacting" than

the constitutional injury-in-fact requirement (App. at 15),[24] but we think that is a misunderstanding of the Code. Persuasive authority indicates that Article III standing and standing under the Bankruptcy Code are effectively co-extensive. *Compare, e.g., The Pitt News*, 215 F.3d at 360 (injury-in-fact requires a "personal stake" in litigation), *and Danvers*, 432 F.3d at 291 (same), *with Amatex*, 755 F.2d at 1042 (party in interest must have a "sufficient stake" in bankruptcy proceedings). Interpreting the "party in interest" requirement as an additional obstacle to bankruptcy standing would frustrate the purpose of § 1109(b), which was intended to "confer[] broad standing at the trial level," *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000), and to "continue[] in [the] tradition" of "encourag[ing] and promot[ing] greater participation in reorganization cases," *Amatex*, 755 F.2d at 1042.[25]

---

[24] The District Court drew that proposition from *In re Fuller-Austin Insulation*, No. 98-2038-JJF, 1998 WL 812388, at *3 (D. Del. 1998), an unpublished decision that relies on a standing analysis in bankruptcy cases under Second Circuit precedent. However, that precedent established that the test for appellate standing, not the statutory limitation on bankruptcy standing, is "more exacting than the constitutional case or controversy requirement imposed by Article III." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 n.2 (2d Cir. 1988). Properly understood, *Kane* is uncontroversial and in accord with our own precedent. *See, e.g., Combustion Eng'g*, 391 F.3d at 215; *Travelers Ins. Co. v. H.K. Porter Co.*, 45 F.3d 737, 741 (3d Cir. 1995).

[25] Without a contrary signal from Congress, we will not read a provision that confers a broad right of participation

23

The question, then, is whether Hartford and Century have demonstrated some injury-in-fact, *i.e.*, some "specific, 'identifiable trifle' of injury," *Bowman*, 672 F.2d at 1151, or "personal stake in the outcome of [the] litigation," *The Pitt News*, 215 F.3d at 360, that is fairly traceable to the GIT

to be a restriction on access to bankruptcy proceedings. Indeed, some commentators have questioned whether standing under § 1109(b) is broader than Article III standing. Paul P. Daley & George W. Shuster, Jr., *Bankruptcy Court Jurisdiction*, 3 DEPAUL BUS. & COM. L.J. 383, 405-06 (2005); *see also* Nathalie D. Martin, *Noneconomic Interests in Bankruptcy: Standing on the Outside Looking In*, 59 OHIO ST. L. J. 429, 448-51 (1998) (arguing that parties should have standing to assert non-pecuniary interests in bankruptcy court and contending that "judges in all fora operate under a world view that most easily recognizes economic interests over other interests"). The courts that have considered that question, however, have determined that bankruptcy standing is not broader than standing under Article III. *E.g., Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 158 (D.N.J. 2005); *Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 649-50 (D. Md. 1998); *SWE & C Liquidating Trust v. Saudi Arabian Oil Co. (In re Stone & Webster, Inc.)*, 373 B.R. 353, 361 (Bankr. D. Del. 2007); *In re A.P.I., Inc.*, 331 B.R. 828, 859-60 (Bankr. D. Minn. 2005). Leaving aside the logical problem in thinking that the constitutional foundation of all standing could support a yet broader standing opportunity, there is no occasion for us to decide the issue here, because, as we discuss, we are satisfied that Hartford and Century have Article III standing and that bankruptcy standing is at least that broad.

Plan.[26]  To put it in "party in interest" terms, the question is simply whether Hartford and Century have legally protected interests that could be affected by the GIT Plan.  Hartford and Century of course assert that they do.  In essence, their argument is that, as funding sources who will have to address the liabilities of the APG Silica Trust, they have more than a trifling injury and certainly have a personal stake in whether the Plan is approved.  GIT, on the other hand, contends that Hartford and Century do not have standing because the Plan preserves their coverage defenses and therefore is "insurance neutral," thus making pecuniary injury arising out of the Plan too speculative.[27]

We addressed the concept of "insurance neutrality" in *Combustion Engineering*, holding that certain insurers there did not have appellate standing to challenge a plan calling for

---

[26] Injury-in-fact and traceability to the GIT Plan cover the injury and causation elements of Article III standing.  There is no dispute that the third element for Article III standing, redressability, exists, since the issues raised by Hartford and Century can be resolved by a ruling in their favor.

[27] GIT also contends, consistent with the Bankruptcy Court's holding, that the anti-assignment provisions in the Objecting Insurers' policies are rendered null by the Bankruptcy Code and state law.  We need not address that argument here because our holding with respect to Hartford's and Century's bankruptcy standing is alone enough to require remand.  Moreover, the discussion of anti-assignment provisions in *Combustion Engineering*, 391 F.3d at 218-20, should suffice.

25

them to fund an asbestos trust because the plan, through its "neutrality" provision, neither increased the insurers' pre-petition obligations nor impaired their pre-petition contractual rights under the subject insurance policies. *See* 391 F.3d at 218. "Insurance neutrality" is a meaningful concept where, as in *Combustion Engineering*, a plan does not materially alter the quantum of liability that the insurers would be called to absorb. Indeed, in *Combustion Engineering*, the pre-petition quantum of asbestos liability was known from four decades of asbestos litigation, and moving the pre-petition asbestos claims out of the tort system and into a trust system did not increase in any meaningful way the insurers' pre-petition exposure to asbestos liability.[28] *See Combustion Eng'g*, 391 F.3d at 200-01.

Here, however, the Plan's promise of an APG Silica Trust appears to have staggeringly increased – by more than 27 times – the pre-petition liability exposure. Thus, on the record here, it cannot fairly be said that the GIT plan is "insurance neutral" in the same sense as was the plan at issue in *Combustion Engineering*.

---

[28] During the plan negotiations in *Combustion Engineering*, an additional 25,000 to 30,000 additional claimants came forward. 391 F.3d at 205. That number, while large in the abstract, does not represent a material increase in pre-petition obligations when one considers that Combustion Engineering had, from the mid-1970s to 2002, dealt with hundreds of thousands of asbestos claims. *See id.* at 203.

26

Nor do we think the plan's adverse effects on Hartford and Century are too speculative to be recognized. In *Clinton v. City of New York*, 524 U.S. 417 (1998), the Supreme Court acknowledged the standing of two groups of plaintiffs who were seeking to challenge the Line Item Veto Act.[29] One group, the City of New York and various healthcare providers, claimed an injury stemming from the President's veto of a statutory provision forgiving the State of New York a healthcare-related, multi-billion-dollar tax debt to the United States. *Id.* at 425-26. Without that forgiveness, the City and the healthcare providers were required to make retroactive tax payments to the State, unless the Department of Health and Human Services granted a request that the State had made for a waiver of the debt. *Id.* at 422, 430. The federal Government argued that the injury was too speculative to create standing because the State's waiver request was still pending. *Id*. at 430. But the Supreme Court disagreed, comparing the veto to

> the judgment of an appellate court setting aside a verdict for the defendant and remanding for a new trial of a multibillion dollar damages claim. Even if the outcome of the second trial is speculative, the reversal, like the President's cancellation, causes a significant immediate

---

[29] The Line Item Veto Act of 1996, 2 U.S.C. §§ 691-692 (1996), gave the President power to cancel certain types of statutory provisions that had been signed into law. *See Clinton*, 524 U.S. at 420-21, 436. The Supreme Court ultimately held the Act to be unconstitutional as a violation of the Presentment Clause, Article I, § 7. *See id.* at 447-48.

27

> injury by depriving the defendant of a favorable final judgment. The revival of a substantial contingent liability immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor.

*Id.* at 430-31.

The second group of plaintiffs in *Clinton* was a farmers' cooperative representing potato growers and an individual member of that cooperative. Those plaintiffs challenged the veto of a limited tax benefit that Congress had enacted to enable the transfer of commodity processing facilities to farmers' cooperatives. *Id.* at 425, 432. Again, the Government contended that the plaintiffs' injuries were too speculative, this time because there was no guarantee that, absent the veto, the cooperative would have been able to purchase a processing facility. *Id.* at 430-32. And, again, the Court rejected the Government's argument. *Id*. at 432. The President, according to the Court, had deprived the cooperative of a "statutory bargaining chip, ... inflict[ing] a sufficient likelihood of economic injury to establish standing under our precedents." *Id.* (citations omitted).

By acknowledging the standing of the New York healthcare providers and New York City, as well as the farmers' cooperative, the Supreme Court established that an injury's having a contingent aspect does not necessarily make that injury incognizable under Article III. *Clinton* recognizes that a tangible disadvantage to the affected party can lead to standing.[30]

---

[30] The Dissent would restrict *Clinton* solely to cases of

Here, the plan's creation of the APG Silica Trust led to a manifold increase in silica-related claims. That constitutes a tangible disadvantage to Hartford and Century, which, despite having their coverage defenses available, will be faced with coverage obligations to the APG Silica Trust in a world that recognizes the existence of over 4,600 silica-related claims, as opposed to a pre-Plan world that recognized only 169. Indeed, the Plan-triggered explosion of new claims creates an entirely new set of administrative costs, including the investigative burden of finding any meritorious suits in the haystack of potentially fraudulent ones. Those costs will be enormous, even if Hartford and Century never pay a single

---

judicial review of legislation. Nothing in *Clinton* itself warrants that limitation, nor does the decision of the United States Court of Appeals for the District of Columbia Circuit that the Dissent cites. That decision, *Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010), distinguished *Clinton* from the controversy then before the D.C. Circuit by noting that the plaintiffs in *Newdow* were not asking the Court to serve as an interpreter of statutory text but were objecting to religious elements in President Obama's inaugural ceremony. Not surprisingly, the D.C. Circuit observed that a "decision committed to the executive discretion of the President or the personal discretion of the President-elect" is far different from a statute, as was at issue in *Clinton*. *Id*. at 1012. We certainly agree that "[a] court-whether via injunctive or declaratory relief-does not sit in judgment of a President's executive decisions." That, however, has nothing to do with the standing issue before us, contrary to the implication of the Dissent.

dollar of indemnity.[31]  Accordingly, even if Hartford's and Century's ultimate liability is contingent, the harm to Hartford and Century from the Plan is hardly too speculative for them to be parties in interest.

The suspect circumstances surrounding the creation of the APG Silica Trust and the questionable provenance of the silica-related claims also fall in favor of recognizing Hartford and Century as parties in interest.  We held in *Congoleum* that insurers had appellate standing to raise an issue regarding disqualification of counsel, reasoning that the issue "implicate[d] the integrity of the bankruptcy court proceeding as a whole" and would "affect the fairness of the entire bankruptcy proceeding."  426 F.3d at 685.  In addition, we noted that granting standing to those insurers was appropriate,

---

[31] The real and immediate cost of exponentially increased liability exposure and new administrative burdens is ignored by our dissenting colleagues, who claim that "[t]he fact that the policies are unchanged by the Reorganization Plan is dispositive." (Dissent slip op. at 5.)  Even on the Dissent's terms, however, focusing just on contract law, it is not accurate to say that the contract language alone is the be-all and end-all for resolving a dispute.  "The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract.  If so, the risk should not fairly be thrown upon the promisor." *City of Littleton v. Employers Fire Ins. Co.*, 453 P.2d 810, 812 (Colo. 1969) (quoting 6 Williston, Contracts § 1931 (rev. ed.)).

since it was "highly unlikely that any of the parties other than the insurers" would raise the issue. *Id.* at 687.

Here, the integrity of the bankruptcy proceeding is called into question by nonfrivolous allegations of collusion between GIT and the asbestos claimants' counsel in negotiating the establishment of the APG Silica Trust and Silica Injunction. Not to put too fine a point on it, the assertion is that GIT sold out Hartford, Century, and similarly-situated insurers by setting up a system in which they would pay for newly ginned-up silica claims in exchange for the asbestos claimants casting their votes in favor of the GIT Plan. It is a profoundly serious charge and not without record support. Moreover, it is a charge that apparently no one has an incentive to pursue, other than the insurers slated to provide coverage to the APG Silica Trust. Since the circumstances in *Congoleum* gave rise to the "more restrictive" appellate standing for the insurers there, *id.* at 685, we think the circumstances here, which may be more disturbing, certainly give rise to bankruptcy standing for Hartford and Century.[32]

---

[32] The Dissent evidently dismisses our standing analysis as founded on nothing more than a naïve concern about some largely imagined and contingent occurrence of the sort common to insurers' risk-taking. (*See* Dissent slip op. at 6-7 ("[T]o say that an insurance company is worried that its risk for future indemnity obligations might be larger than it projected when it established the insurance policy is another way of describing the leitmotif of the insurance industry within the normal course of business.").) Whatever else the normal course of the insurance business may entail, though, it certainly ought not include judicial approval for

31

In sum, we conclude that Hartford and Century have legally protected interests as insurers on policies to be transferred to the APG Silica Trust and that their interests are affected by the GIT Plan such that they should have an opportunity to challenge the Plan in the Bankruptcy Court. Recognizing Hartford's and Century's bankruptcy standing is particularly appropriate because the challenges they want to bring implicate the integrity of the bankruptcy process.

We are aware that, although the Bankruptcy Court denied Hartford and Century standing, it considered many of the issues that Hartford and Century press in regard to the APG Silica Trust and Silica Injunction. But Hartford's and Century's entitlement to appear as parties in interest remains, even if the Bankruptcy Court may have considered some of the issues previously. Furthermore, while we appreciate the analysis evident in the Bankruptcy Court's opinion, we think that, on this record, a more searching review of Hartford's and Century's allegations of collusion between the debtors and counsel for the silica claimants is warranted.[33] On

---

liability manufactured by and for the benefit of the insured, as is the central concern in this appeal. That concern goes unaddressed by the Dissent, despite our precedent in *Congoleum*, and should be sufficient itself to demonstrate that the Dissent's cry of "staggering" implications for Article III standing (Dissent slip op. at 8) is greatly exaggerated.

[33] The Dissent insists that the Bankruptcy Court has already conducted the most searching review possible. (Dissent slip op. at n.2.) It is theoretically possible that that will turn out to be true, but we are not prepared to say so in advance, as does the Dissent. Rather, we accept the logical

remand, the Bankruptcy Court should make sufficient findings regarding those allegations so that, in the event there is a further appeal, a determination can be made on whether there is a legitimate basis for concluding that the APG Silica Trust and Silica Injunction are necessary to the reorganization and fair.[34]

Because of the need to supplement the factual record, we defer consideration of the merits of the Objecting Insurers' arguments regarding the lawfulness of the APG Silica Trust and Silica Injunction, which are questions that can best be answered in the first instance by the Bankruptcy Court after all of the parties have had a full opportunity to

proposition that a party, granted standing and a full opportunity to participate, may add something meaningful to the record on which the Bankruptcy Court is called to make a decision. We do not denigrate the work done by the Bankruptcy Court already, but neither do we believe it has done all that is necessary, including rendering some judgment regarding the allegations of fraud and collusion advanced by the Objecting Insurers.

[34] If it approves a plan of reorganization for GIT that includes a channeling injunction and trust for silicosis claims, the Bankruptcy Court may also need to address the procedures by which the trust calls for claim funds to be distributed. For example, it may be advisable to examine whether those procedures would require claims to be paid based upon proof of exposure and diagnosis alone, without regard to any affirmative defenses available under state law, and, if so, whether those procedures would then cause the trust to violate 11 U.S.C. § 502, as argued by AIG.

present evidence and argument.[35]  We likewise decline at this time to address whether the Objecting Insurers' have appellate standing, as it is unnecessary to our decision regarding bankruptcy standing and also because the Bankruptcy Court's disposition on remand may alter the analysis.[36]

## III.    Conclusion

Because Hartford and Century meet the standing requirements prescribed by Article III and the Bankruptcy Code, they must be afforded the opportunity to be heard concerning whether it is lawful to channel silica-related

---

[35] The Dissent questions whether we generally oppose the use of settlement trusts to address mass tort liability.  We of course do not, but do question the record support to date for the establishment of such a trust in this case.

[36] In examining whether parties are "persons aggrieved" for purposes of appellate standing in a bankruptcy case, we are particularly concerned with separating those who are "directly and adversely affected pecuniarily by an order or decree of the bankruptcy court," from "the myriad of parties … indirectly affected by every bankruptcy court order." *Combustion Eng'g*, 391, F.3d at 214-15 (internal quotation marks omitted).  Because we cannot now know the contours of any revised order the Bankruptcy Court might issue on remand, any inquiry into the directness or indirectness of the Objecting Insurers' injury would be premature.  Should this same issue arise again after remand, however, we trust that the implications of our decision in *Congoleum* will be taken into account.

claims against GIT into a settlement trust in the context of GIT's reorganization. Thus, we will vacate the District Court's order and require remand of the matter to the Bankruptcy Court for further proceedings consistent with this opinion.

*In re Global Industrial Technologies,* No. 08-3650

NYGAARD, Circuit Judge, with whom Circuit Judges SCIRICA, FUENTES, and FISHER join, dissenting.

The majority's grant of standing to parties who have no injury, either actual or contingent, is a departure from the well-established requisite of an injury in fact, and it has broad deleterious implications for the jurisprudence of Article III standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992). To be clear, nothing in the record—amassed over five years with the full participation of the excess insurers—and nothing in the Reorganization Plan itself, substantiates the excess insurers' claims that they have incurred or will incur an injury in fact as a result of Global's petition for reorganization under Chapter 11 of the Bankruptcy Code.

Moreover, fully aware of past abuse in the realm of silicosis claims in unrelated cases in other courts, the Bankruptcy Court in this case established the facial legitimacy of claims by requiring a proffer of information from claimants under penalty of perjury. Most importantly, Hartford, Century and AIG have conceded any challenge to the court's factual findings in this regard.[1] Relying upon

---

[1] In their reply brief Hartford and Century conceded their challenges to assertions of the Bankruptcy Court's factual error, clarifying that: "the [B]ankruptcy [C]ourt erred in granting the §105 injunction *not because its findings of fact were erroneous*, but rather because it failed to make - and on the record could not make - the specific and concrete findings to support the showing of "necessity" that Continental

these findings, and those regarding the reorganized entity's financial viability (that are also unchallenged by the excess insurers), the Bankruptcy Court already established the necessity of the Silica Trust.[2]  Finally, from a practical perspective, the majority's remand will needlessly delay an already protracted proceeding to rehash a record that is already complete, a move that may very well imperil

requires."  (Emphasis added.)  AIG fully adopted the arguments of Hartford, and did not provide any indication to this Court that it disagrees with this particular statement.  I note also that references to "Hartford," "Century" and "AIG" are consistent with their use in the majority opinion.

[2]I reject the multiple inferences throughout the majority opinion that the Bankruptcy Court conducted anything less than a thorough, responsible investigation into every claim raised by the insurers.  Indeed, the suggestion that the Bankruptcy Court should, on remand, conduct a "more searching review of Hartford and Century's allegations" belies the record in this case.  Having failed to impress the Bankruptcy Court with its claims of rampant fraud and collusion through nothing more than bald, unsubstantiated inference, the majority now apparently seeks to give these insurers a second bite of the apple to make a case that is fatally flawed.  Unless the majority is suggesting that Bankruptcy Court should provide a forum for their premature coverage claims—an instruction that would raise further justiciability issues—it is my position that it has conducted an admirable, exhaustive review.  For that reason, I believe that a section 105 injunction would be warranted even if Hartford and Century had standing.

2

financing on which the reorganized entity is relying to succeed.  This contravenes the intent of the Bankruptcy Code, and seriously undermines a process authorized by Congress to address asbestos claims.  *See* 11 U.S.C. § 524(g).[3]  For all of these reasons, I dissent.

The excess insurers conjure up an injury through the Plan's supposed impact on the insurance contracts.  However, three technical amendments to the Reorganization Plan, explicitly considered by the Bankruptcy Court, ensure that the contractual relationship between the insurers and insured emerges post-reorganization unchanged.

> 4.4.1 No Preclusion from Asserting Claims, etc.  Nothing in the GIT Plan, in any of the Plan Documents, or in the Confirmation Order shall preclude any Entity from asserting in any proceedings any and all claims, defenses, rights, or causes of

---

[3]If the central issue for the majority is a general opposition to the use of settlement trusts to resolve claims of this sort, I regard Congress as the proper forum for resolving such concerns rather than the judiciary.  *See* Lloyd Dixon, Geoffrey McGovern, & Amy Coombe*, Asbestos Bankruptcy Trusts:  An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts,* Rand, Institute for Civil Justice (2010).  To be sure, numerous questions persist in the complex realm of asbestosis and silicosis claim litigation.   Yet, we must work with the statutes, our precedent, and the record as it is, not as we wish it to be.

3

action that it has or may have under or in connection with any of the APG Silica Trust Policies, except claims, defenses, rights or causes of action held by an insurer that are based on or arise out of any "anti-assignment" provision(s) in such policies. Subject to the foregoing, and to the provisions of Section 4.4.2 and 4.4.3, nothing in the GIT Plan, in any of the Plan Documents, or in the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in the APG Silica Trust Policies, including (but not limited to) any and all such claims, defenses, rights or causes of action based upon or arising out of any APG Silica Trust Claim that is liquidated, resolved, discharged, channeled or paid in connection with the GIT Plan.

4.4.2 No Impairment of Rights. Notwithstanding anything to the contrary in the GIT Plan, in any of

the Plan Documents, or in the Confirmation Order, nothing in the GIT Plan, the Plan Documents or the Confirmation Order (including any other provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing any insurer's legal, equitable or contractual rights under the APG Silica Trust Policies in any respect other than the enforcement of any "anti-assignment" provision(s) in such policies. Subject to the foregoing, the rights of the insurers shall be determined according to the terms of the APG Silica Trust Policies, as applicable.

4.4.3 No Assertion of Preclusion, etc. Notwithstanding anything to the contrary in the GIT Plan, in any of the Plan Documents, or in the Confirmation Order, under no circumstances shall any person or Entity be permitted to assert issue preclusion or claim preclusion, waiver, estoppel, consent, or any other legal or equitable theory against any insurer under any APG Silica Trust Policy as to the

existence, enforceability or amount of any APG Silica Claim or Demand on the basis of the submission, valuation, resolution and/or payment of any APG Silica Trust Claim by the APG Silica Trust. The submission of an APG Trust Claim by a claimant, and valuation, resolution and/or payment of an APG Silica Trust Claim by the APG Silica Trust, shall be wholly without prejudice to any and all rights of the parties in all other contexts or forums, and shall not be deemed (unless otherwise determined by a Court of competent jurisdiction) to be a triggering event for liability under any APG Silica Trust Policy.

Third Amended Plan of Reorganization of Global Industrial Technologies, Inc., ET AL., 23, December 8, 2005, ECF No. 7827. The record contains lengthy, substantive, discussion of these provisions, making clear the intent of the Trustee to mirror the language used in *In re Combustion Engineering, Inc.,* which we characterized as insurance-neutral. 391 F. 3d 190, 218 (3d Cir. 2004). The majority distinguishes the instant case from *Combustion Engineering* by asserting that the "quantum of liability" post-petition for the excess insurers is proportionately larger in this case. Yet, leaving aside for the moment the fact that the record does not support an assertion of increased liability for the excess insurers, the majority fails to explain how this is even relevant to the

6

analysis. *Combustion Engineering*'s characterization of these provisions as insurance-neutral is integral to its holding and must be followed here. As a result, the majority errs factually and as a matter of law by implying that the Reorganization Plan causes an injury in fact to the excess insurers by modifying the terms of the insurance contracts.[4]

Therefore, even if we accept the worst-case scenario posited by Hartford and Century, where the Silica Trust actually settles claims in excess of the thirty-five million dollar fund established in the Plan, and it submits claims of indemnity that the excess insurers regard as beyond the scope of coverage, fraudulent, or over-valued, they are still not injured. This is so because they have the same full range of contractual rights to protect their interests for which they bargained at the inception of the insurance contracts pre-petition. Indeed, the excess insurers themselves admitted that the Silica Trust would still face the burden of first establishing its right to coverage under the pre-petition policies. For these reasons, the record does not support the majority's assertion that these claims represent a contingent liability sufficient to ground standing. Given the multitude of

---

[4] In footnotes 20 and 23, the majority does not clearly articulate a position on whether the anti-assignment provisions of this Reorganization Plan constitute a contractual injury, given our holding in *Combustion Engineering* that validated the Bankruptcy Code's authorization to preempt anti-assignment policy provisions. 319 F.3d at 218-20. I interpret our holding in *Combustion Engineering* on anti-assignment provisions as both fully applicable to this case and regard it as binding precedent that eliminates any claim by the insurers that this provision is the source of any injury.

variables at issue here, the only reliable points of reference with respect to the excess insurers are the insurance contracts. The fact that the policies are unchanged by the Reorganization Plan is dispositive.

Moreover, contrary to the majority's assertion, jurisprudence on standing does not support their position in this case. They point to the holding in *Clinton v. New York*, 524 U.S. 417, 429-436 (1998) to suggest that the Supreme Court has already extended the bounds of Article III standing to include entities that present nothing more than a possibility of future impacts. Yet, as noted by the Court of Appeals for the District of Columbia, *Clinton* is properly read precisely for what it is: "a basic case of judicial review of legislation." *Newdow v. Roberts,* 603 F.3d 1002, 1012 (D.C. Cir. 2010). The entities involved here were in the highly unusual circumstance of asserting standing to challenge the President's line item veto of specific legislative provisions that had been crafted and duly authorized by Congress for their benefit. Without the grant of standing, the parties in *Clinton v. New York* would have been denied access to any judicial fora to launch their case because the intended legislated benefits vanished with the veto before they became law. Within this highly unusual context, there was a clear rationale for the Supreme Court to stretch the requirements of constitutional standing to recognize specific, prospective benefits of the legislation, and the impacts of the loss of those benefits, to enable a constitutional challenge to the President's line item veto.

The majority's reliance upon *Clinton* in this case, where it is beyond question that the excess insurers will—if needed—have standing to raise contractual issues in court at

8

the appropriate time and place, uproots long held and traditional principles of standing. *See Lujan*, 504 U.S. at 564 n.2 ("It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control.") Moreover, in its haste to give the excess insurers standing to challenge this Reorganization Plan the majority dilutes the definition of injury in fact, with alarming consequences.

The closest that the majority comes to actually describing the impact that the Reorganization Plan might have upon the excess insurers is to say that their "quantum of liability" might be impacted in the future, or that there might be a "tangible disadvantage." Yet, to say that an insurance company is worried that its risk for future indemnity obligations might be larger than it projected when it established the insurance policy is another way of describing the leitmotif of the insurance industry within its normal course of business. That, at some point in the future, the scope of coverage determined by an insurer at a policy's inception may include liabilities that the insurer failed to consider when it priced the policy is of no moment to the bankruptcy proceedings. Moreover, even if an insurer may incur costs in conducting claim evaluations and other expenses in litigating those they deny, none of this puts the insurer outside of the milieu in which it operates day to day. Considering all of this, I cannot find any rationale to extend the definition of injury in fact to include the risks that occur to insurers within the normal course of their business. Particularly given the highly speculative nature of the impacts claimed here, the Bankruptcy Court correctly kept its eye on the ball, ascertaining whether the Reorganization Plan altered

9

the contractual relationship between insurers and insured. It did not err in concluding that this relationship remains unaltered post-reorganization.

Moreover, by misapplying *Clinton*, the majority generally lowers, at a minimum, the threshold for injury in fact to include anyone who can conjure up the mere risk of a future business impact. The majority's detour from the standard analytic pathway for determining contingent injury ensures that bankruptcy courts will, henceforth, be burdened with determining whether sufficient injury exists among a broad new class of persons who, to obtain party in interest standing, may now allege only a fear that future business dealings with the reorganized entity may result in less profit than projected.[5] In my view, the effects of this type of approach to Article III standing beyond the realm of bankruptcy are staggering.

I agree with the majority's statement that party in interest standing is to be broadly construed. However, I disagree that a generous interpretation of Article III standing in the bankruptcy context should extend to entities that have, in spite of ample opportunity, utterly failed to provide any evidence that the Reorganization Plan inflicts any injury upon them. Accordingly, I respectfully dissent.

---

[5] One can also reasonably posit collateral complications to the general analysis of the justiciability of claims if the majority's position is applied to the doctrine of ripeness, given the obvious intent of the insurers to launch premature coverage disputes.